UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

RICHARD C. LAWHORN,                    )
                                       )
                Plaintiff,             )
                                       )
v.                                     )        No.:   3:05-CV-148
                                       )               (VARLAN/SHIRLEY)
NORTEL NETWORKS, INC. and THE          )
PRUDENTIAL INSURANCE COMPANY           )
OF AMERICA,                            )
                                       )
                Defendants.            )

## MEMORANDUM OPINION

Plaintiff Richard Lawhorn filed this action under the Employee Retirement Income

Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*., to recover long-term disability benefits

from defendants Nortel Network, Inc. ("Nortel") and The Prudential Life Insurance Company

of America ("Prudential").  The case is before the Court on the plaintiff's Motion for

Judgment on the Record [Doc. 20] and the defendants' Motion for Judgment Affirming the

Decision of the Employee Benefits Committee [Doc. 21].  The Court previously ordered

[Doc. 17] that plaintiff's state law claims of breach of contract, bad faith, and breach of

fiduciary duty be dismissed as a result of stipulation by the parties to that effect.

Accordingly, plaintiff's remaining claims are for breach of fiduciary duty pursuant to ERISA

and denial of ERISA benefits. [*Id.* at 1.]  Plaintiff argues that defendants acted arbitrarily and

capriciously in the refusal to continue payment of his long term disability benefits and urges

the Court to reverse defendants' administrative decision to that effect.  Defendants argue that

the decision to deny plaintiff long term disability benefits is supported by the administrative record and should be affirmed.  The Court has carefully considered the parties' briefs [Docs. 20, 22, 23, 24, 25], as well as the entire administrative record.

For the reasons set forth herein, the Court will deny plaintiff's motion for judgment on the record and grant defendants' motion for entry of judgment.

I.  **Relevant Facts**

Nortel employed plaintiff as Project Manager from August 10, 1987, until approximately August 2001. [Doc. 6 at ¶ 3; Administrative Record ("AR") at 423].  As a Project Manager, plaintiff did the majority of his work, including writing and responding to e-mails, taking and making phone calls, and writing and presenting reports, while sitting at a desk in his office. [AR at 450.] The position did not require that plaintiff undertake any lifting or heavy physical activities, [*id.*], and required "only occasional reaching, handling, and fingering." [AR at 444.]  The position has been described as being "sedentary." [*E.g.*, AR at 431, 444.]

As an employee of Nortel, plaintiff was covered under Nortel's FLEX Benefits Plan (the "Plan"), a plan providing short- and long-term disability benefits and subject to ERISA. [AR at 1-23.]  Under the terms of the Plan, Nortel is the plan administrator [*id.* at 66], Prudential is the claims administrator [AR at 69], and Nortel's Employee Benefits Committee ("EBC"), a specific department within Nortel, "is the final authority to review denied Claims." [*Id.*]  The Plan also states that a covered individual is considered totally disabled

and therefore qualified to receive long-term disability benefits "if a Physician certifies that you cannot work because of an Illness or accidental Injury, and the clinical evidence supports this opinion." [AR at 16.] The Plan provides that a covered individual "must provide written proof of your Total Disability to the Claims Administrator, who will make the final determination of disability." [*Id.*] Lastly, the Plan sets forth two definitions of what it means to be "unable to work," with these varying based upon how long the covered individual has been receiving disability benefits:

> During the first 18 months of covered Total Disability (from the first date of STD), you will be considered unable to work if you cannot perform the work you were normally performing at the time of your disability with or without reasonable accommodations for the limitations resulting from your Illness or Injury.
>
> After the first 18 months of covered Total Disability (from the first date of STD), you will be considered unable to work if you are unable to perform any reasonable occupation. A "reasonable occupation" is any job you are or could become qualified to do with your education, training or experience."

[AR at 16.] Accordingly, the Plan provides that long-term disability benefits end when "[y]ou stop being Totally Disabled" or "[y]ou are able to return to work at any reasonable occupation...." [AR at 17.]

On August 9, 2001, plaintiff went out of work on short-term disability as a result of a diagnosis of bilateral carpal tunnel syndrome. [AR at 111, 424, 437.] On October 5, 2001, upon being referred to him for evaluation, plaintiff saw Dr. Thomas M. Koenig, an orthopedic surgeon, who confirmed that plaintiff had moderate carpal tunnel syndrome in his right hand and mild to moderate carpal tunnel syndrome in his left hand. [AR at 340.] Dr. Koenig opined that plaintiff's carpal tunnel syndrome was "likely to require surgery in the

future" and recommended that, "[f]rom an orthopedic standpoint, should the surgical option be chosen, it would be better to do this sooner rather than later...." [*Id.*] Dr. Koenig also noted that plaintiff could return to "modified duty" at work and stipulated that it entail "no repetative [sic] frequent gripping or grabbing, or typing, no lifting > 25 lbs, no shifts > 8 hours...." [AR at 341.]

Plaintiff did in fact have surgery on his left wrist on November 6, 2001 and subsequently saw Dr. Koenig for a post-operative examination on November 14, 2001. [AR at 342.] In his report of this visit, Dr. Koenig noted that plaintiff was presently "unable to work," [AR at 343], but that he had "responded well" to the surgery on his left wrist and that "[h]e noted 65% improvement in his right wrist" as a result of a cortisone injection administered to plaintiff on the October 5, 2001 visit. [AR at 342.] A second post-operative visit with Dr. Koenig on November 19, 2001 confirmed again that plaintiff had "[r]esponded well" to surgery, [AR at 345], and noted that plaintiff would be able to "return to modified duty" at work. [AR at 347.]

On a January 15, 2002 visit, Dr. Koenig referred plaintiff to Dr. Berta Bergia, a neurologist, "to rule out residual left [carpal tunnel syndrome] following his surgery." [AR at 352.] Dr. Bergia examined plaintiff on February 20, 2002, and noted that "[n]o residual carpal tunnel was seen." [AR at 391.] Also during this time period, plaintiff's short-term disability benefits were exhausted on February 7, 2002, at which point plaintiff applied for and was granted long-term disability benefits. [Doc. 20 at 3; AR at 111.]

Plaintiff went on to see Dr. Koenig five more times in 2002.[1]  With each visit, Dr. Koenig's records noted that plaintiff was permitted to work "modified duty," which consisted of the following: "(1) no overhead work (2) lifting restrictions of 30 lbs. (3) frequent changes in position to standing or sitting." [*E.g.*, AR at 370.] On October 15, 2002, Dr. Koenig referred plaintiff to Dr. C. Sanford Carlson, also an orthopedic surgeon, for a second opinion as to the prognosis for his carpal tunnel syndrome.  [AR at 330.] Dr. Carlson opined that plaintiff "needs to continue active use of his left hand" and "should at this point return to modified duty using his computer to the best of his ability, even if he has to go very slowly." [AR at 332.] Dr. Carlson went on to note that "[t]he dexterity required by the computer would be very good exercise for the patient, even if he is slow when doing it." [*Id.*]

On January 7, 2003, Prudential sent plaintiff a letter informing him that his long-term disability benefits would be terminated effective as of February 7, 2003. [AR at 322.] In that letter, Prudential stated that because plaintiff's initial 18-month long-term disability benefit coverage would end on February 7, 2003, plaintiff was then subject to the higher standard of needing to be "unable to perform any reasonable occupation" to continue to receive benefits, as opposed to only needing to prove that his disability preventing him from "performing work you were normally performing," and determined that plaintiff did not meet this standard.  [AR at 323.] The letter went on to detail the various medical conclusions of

---

[1]The dates of these visits were  February 27, 2002, April 1, 2002, April 23, 2002, May 21, 2002, and June 4, 2002. [AR at 354-373.]

Dr. Koenig and Dr. Carlson that support Prudential's termination of plaintiff's benefits. These include the following:

- The April 2002 evaluation by Dr. Koenig indicating that plaintiff could return to work with restrictions on lifting and typing.

- The October 2002 evaluation from Dr. Carlson noting that plaintiff's carpal tunnel syndrome was not a severe case and that it may resolve completely. As a result, Dr. Carlson recommended that plaintiff not have surgery on his right hand "at this time" and that plaintiff should "continue active use of [his] left hand." [AR at 332.]

[AR at 323.] This letter acknowledged that plaintiff was "not able to return to your previous job as a Market Project Manager," but concluded that plaintiff was "physically capable of performing another job that requires less repetitive hand motion/typing." [AR at 324.] The letter also noted that "Dr. Carlson actually recommends use of the computer to the best of your ability, even if you have to go very slowly." [*Id.*]

On April 7, 2003, plaintiff filed an appeal of the EBC's decision to terminate his long-term disability benefits. [AR at 314.] In this letter, plaintiff indicated he was basing his appeal upon an attached Functional Capacity Evaluation ("FCE") performed by Knoxville Physical Therapy, Inc. on March 18, 2003, which plaintiff claimed indicated that he was then "unable to perform the tasks of sedentary work or any other job due to my on going problems." [*Id.*] Examination of the FCE itself reveals that while it noted that plaintiff "does not tolerate prolonged sitting required for most sedentary jobs," it stated that plaintiff qualifies for the U.S. Department of Labor Job Classification of "sedentary" and remarked

that plaintiff "tolerates sitting doing keyboard or computer work intermittently for 4 hours/day with stretch breaks." [AR at 315.]

As a result of this appeal, Prudential sent plaintiff a letter on May 6, 2003 requesting that he undergo an Independent Medical Examination ("IME") to be performed by Dr. Bergia.[2] [AR at 296-297.] Dr. Bergia examined plaintiff on August 20, 2003 and after recounting his lengthy medical history, concluded the following:

> Based on the examination and review of the job description, this gentleman should be able to perform his job with job modification. He would not be able to do continuous repetitive typing with his hands given his carpal tunnel syndrome and complex regional pain syndrome. However, returning him to work initially four to six hours a day as recommended by Dr. Carlson with typing for no more than one hour at a time with breaks and sitting for no more than one hour at a time with frequent breaks would be able to be performed.

[AR at 265.]

On October 13, 2003, Prudential sent plaintiff a letter in which it informed plaintiff of its decision to uphold its previous determination to terminate his long-term disability claim effective February 7, 2003. [AR at 254-257.] Like the January 7, 2003 letter initially denying plaintiff benefits, this letter noted the heightened standard of disability applicable to plaintiff given that he had passed his first eighteen months of coverage, [AR at 254] and referred to the January 2003 letter's reasons for denying plaintiff's claim for disabilities. [AR at 255.] However, this letter also went on to reference medical examinations of plaintiff conducted

---

[2]This is the same Dr. Bergia to whom plaintiff had been referred by Dr. Koenig in February 2002. [AR at 352.]

subsequent to Prudential's denial of benefits as supporting the decision to uphold the denial of benefits to plaintiff. These include:

- The August 20, 2003 IME performed by Dr. Bergia, in which she recommended that plaintiff perform some sort of work as part of his continuing treatment.

- The March 18, 2003 FCE performed by Knoxville Physical Therapy, Inc. in which it was recommended that plaintiff avoid prolonged sitting, bending, standing or kneeling in a static position, but determined that plaintiff would be able to work with some reasonable accommodations.

[AR at 255.]

On October 31, 2003, plaintiff, through his attorney, filed his second appeal of the EBC's decision to terminate his long-term disability benefits and at the same time, requested an extension of sixty days, until February 13, 2004, "within which [plaintiff] could otherwise perfect his appeal. [AR at 249.] Nortel responded to this request on November 8, 2003 and granted plaintiff a thirty-day extension, until January 13, 2004. [AR at 247.]

On January 22, 2004, plaintiff's attorney submitted the medical report of Dr. David Rouben coming out of an examination of plaintiff on January 8, 2004. [AR at 225.] Dr. Rouben's report stated that plaintiff "is doing great and the x-rays look terrific" and noted that plaintiff "may return to normal activities as tolerated based on the examination performed." [AR at 227.] On March 8, 2004, plaintiff's attorney submitted a Tennessee Department of Labor and Work Force Development Standard Medical Form prepared by Dr. Rouben on February 16, 2004. [AR at 185-193.] On this form, Dr. Rouben filled in a chart indicating that plaintiff was "temporarily totally disabled" from August 2001 to the present,

[AR at 191], but on the following page, entitled "Functional Capacity Assessment," indicated that plaintiff could sit, stand, and walk for a total of six hours of an eight-hour day, engage in frequent but limited balancing, stooping, kneeling, crouching, crawling and twisting, and that any restrictions were "specific to his hands." [AR at 192.] Finally, on March 12, 2004, plaintiff's attorney submitted another medical report undertaken by Dr. Frank H. McNiel on March 9, 2004 in which he opined that plaintiff's "condition is not improving" and that "he is totally disabled and unemployable." [AR at 196.]

On June 9, 2004, plaintiff was released to work by Dr. Koenig. [AR at 139.] In this release form, Dr. Koenig stipulated that plaintiff could return to work with the restriction of "sedentary only as described by the Dictionary of Occupational Titles; 8 hr. max. shift." [*Id.*]

Shortly thereafter, as a part of the EBC's review of plaintiff's second appeal, the EBC ordered that plaintiff's medical records be reviewed by Dr. Richard B. Brown, a neurologist. [AR at 154-158]. This review was conducted on June 23, 2004, and, upon examining thirteen medical reports on plaintiff's condition from various physicians, Dr. Brown concluded the following:

> I believe this patient could perform the tasks described in his job description with accommodations. I would agree with the 6/9/04 return to work slip in that he could perform an 8 hour shift in a sedentary position with maximum typing or computer use for one hour with breaks as needed. I believe that these are the only accommodations which would be required for this employee to return to work.

[AR at 157.] Dr. Brown's review concluded with the opinion that plaintiff "was qualified to return to work, with the accommodations I have described, as of the date of his last evaluation which was performed in August 2003." [AR at 158.]

On August 25, 2004, Nortel sent plaintiff's attorney a sixteen-page letter informing him that the EBC had voted to extend his long-term disability benefits from the original termination date of February 7, 2003, until August 20, 2003, [AR at 109], but that plaintiff's long-term disability benefits would be terminated as of that date because "an independent medical evaluation established definitively that [plaintiff] no longer met the criteria for a disability benefit under the terms of the LTD Plan." [AR at 123.] The letter provided a detailed explanation for the EBC's determination to uphold its original decision terminate plaintiff's benefits, including the following:

- The June 23, 2004 report prepared by Dr. Brown in which he stated his belief that plaintiff "could perform the tasks described in his job description with accommodation," [AR at 157], and that plaintiff "was qualified to return to work, with the accommodations I have described, as of the date of his last evaluation which was performed August 2003." [AR at 158.]

- The June 16, 2004 work release signed by Dr. Koenig indicating that plaintiff could return to on limited duty with certain restrictions.

[AR at 110.]

As a result, plaintiff filed this action on February 23, 2005 in Knox County Chancery Court. Defendants removed the case to this Court on March 18, 2005, on the basis of federal question jurisdiction. [Doc. 1.]

I.      **Analysis**

A.      Standard of review

This action seeking a review of the denial of plaintiff's benefits is governed by

ERISA, 29 U.S.C. § 1132(a)(1)(B), which provides as follows:

> A civil action may be brought by a participant or beneficiary to recover
> benefits due to him under the terms of his plan, to enforce his rights under the
> terms of the plan, or to clarify his rights to further benefits under the terms of
> the plan.

In *Wilkins v. Baptist Healthcare Systems*, 150 F.3d 609, 617-20 (6th Cir. 1998), the Sixth

Circuit established guidelines under which district courts must adjudicate ERISA cases

brought before them for judicial review.  The Sixth Circuit explained that using summary

judgment as a tool for the adjudication of ERISA cases does not properly comport with the

purpose of summary judgment.  *Id*. at 619.  Because the role of a district court in ERISA

matters is not to determine whether issues of fact exist for trial, but to review the

administrative record before it, district courts should more properly characterize their role

in such proceedings as encompassing elements of both bench trials and summary judgments.

*Id*. at 619-20.   Following these guidelines, the district court proceeds by making

adjudications on both fact and law as would occur in a bench trial while handling the matter

in an expedited fashion resembling summary judgment.  *Id*.

Furthermore, *Wilkins*, following Supreme Court precedent, dictates this Court's

standard of review in ERISA matters.  Under *Wilkins*, this Court has two possible standards

of review.  If the trustees of an employee benefits plan do not have discretion to determine

eligibility for benefits or to construe the terms of the plan in question, a court is required to undertake a *de novo* review of the administrators' decision. *Id*. at 613. On the other hand, where a benefits plan vests discretion with the administrators, a court may only disturb the administrators' decision if it finds the basis of such a decision to be arbitrary and capricious. *Id*. at 616 (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). Significantly, regardless of the standard of review applied to the administrators' decision, "in an ERISA claim contesting a denial of benefits, the district court is strictly limited to a consideration of the information actually considered by the administrator." *Killian v. Healthsource Provident Admin., Inc.*, 152 F.3d 514, 522 (6th Cir. 1998) (citing *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir. 1990)).

There is some confusion over the applicable standard of review in this case. In his amended complaint and motion for judgment on the record, plaintiff states that the arbitrary and capricious standard of review applies in this case, [Doc. 6 at ¶ 13; Doc. 20 at 2], and defendants state the same in their motion for judgment [Doc. 22 at 13]. However, plaintiff attempts to depart from this assertion in his response to defendants' motion for judgment and for the first time argues that defendants' denial of long-term disability benefits is subject to *de novo* review. [Doc. 23 at 13.] In support of this contention, plaintiff admits that the Plan "does contain a general grant of discretion" to the plan administrator, but argues that the plan administrator is defendant Prudential, and not Nortel, thereby making *de novo* review appropriate because the decision to terminate plaintiff's disability benefits was made by Nortel. [*Id.* at 12.] Defendants argue that the plan explicitly provides that defendant Nortel

is the plan administrator, while Prudential is the third-party claims administrator. [Doc. 25 at 2.] Defendants further contend that because defendant Nortel acts through the EBC, any determinations by the EBC are subject to the arbitrary and capricious standard of review. [*Id.*]

In this case, the Plan states as follows:

The EBC has the final discretionary authority to construe and interpret the plan, to decide all questions of eligibility for benefits and to determine the amount of such benefits. The EBC's decisions on such matters are final and conclusive.

[AR at 75.] The Plan further provides that "Nortel Networks, Inc. ('Company') is the Plan Administrator" and that Nortel's EBC "is the final authority to review denied claims." [*Id.* at 66.] The plain language of the Plan explicitly vests the plan administrator, here, defendant Nortel and the EBC, with discretionary authority to determine eligibility for benefits and to construe the terms of the Plan. Accordingly, the arbitrary and capricious standard of review applies, *Firestone*, 489 U.S. at 115, and plaintiff's belated attempt to advocate for a different standard of review is not well-taken.

Thus, the issue now before the Court is whether defendants' denial of long-term disability benefits to plaintiff constitutes an arbitrary and capricious decision based upon the administrative record. "This standard is the least demanding form of judicial review of administrative action. When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Killian*, 152 F.3d at 520 (citations and internal quotation marks removed). Applying this standard of review requires that the plan administrator's "decision be upheld if it is the result of a

deliberate, principled reasoning process and if it is supported by substantial evidence." *Baker v. United Mine Workers of Am. Health and Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991). If the decision was arbitrary, capricious, not supported by substantial evidence or contrary to the law, the decision will be overturned. *Daniels v. Sovereign Coal Corp.*, 1995 WL 230285 at **1 (6th Cir. April 14, 1995) (citations omitted). Finally, "merely because [the Court's] review must be deferential does not mean [its] review must also be inconsequential. While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decision only for the purpose of rubber stamping those decisions." *Moon v. Unum Provident Corp.*, 405 F.3d 373, 378 (6th Cir. 2005).

B.     <u>Breach of Fiduciary Duty</u>

While plaintiff's state law claim for breach of fiduciary duty was dismissed with prejudice by order of the Court, [*see* Doc. 17], plaintiff continues to raise the issue of defendants' alleged breach of fiduciary duty. [Doc. 6 at ¶ 12; Doc. 20 at 13; Doc. 23 at 22-23]. However, as defendants correctly note, [Doc. 22 at 19], it is not clear from plaintiff's briefs the statutory provision of ERISA upon which plaintiff is grounding his claim for breach of fiduciary duty. Rather, plaintiff's argument as to breach of fiduciary duty seems to be based solely on defendants' purported failure to provide him with "mandatory" rehabilitative assistance. [Doc. 20 at 13.] Out of an abundance of caution, however, the Court will assume plaintiff is arguing breach of duty in support of his claim for long-term disability benefits.

To the extent that plaintiff is pursuing his breach of fiduciary duty claim under ERISA's fiduciary duty provision, 29 U.S.C. § 1109, defendants would be entitled to judgment as a matter of law, as that section "allows relief only for an entire plan and not for individual participants or beneficiaries." *Bagsby v. Cent. States, Se. & Sw. Areas Pension Fund*, 162 F.3d 424, 430 (6th Cir. 1998). As the Sixth Circuit has emphasized, "although an individual may bring a section 409 claim, ERISA does not permit recovery by an individual who claims breach of fiduciary duty." *Weiner v. Klais and Co., Inc.*, 108 F.3d 86, 92 (6th Cir. 1997).

To the extent that plaintiff is pursuing his breach of fiduciary duty claim under § 1132(a)(3)), that section is inapplicable to plaintiff since he is also pursuing a claim for denial of benefits in this action. As the Supreme Court held in *Vanity Corp. v. Howe*, a claim for benefits pursuant to 29 U.S.C. § 1132(a)(1)(B) is the exclusive remedy under ERISA by a claimant for personal recovery when that remedy is available, as it is in this case. 516 U.S. 489, 512 (1996). Here, because plaintiff is pursuing a claim for a denial benefits under that chief remedy provision, [*see* Doc. 6 at ¶ 13], he is not entitled to also recover for defendants' alleged breach of fiduciary duty. *Vanity Corp.*, 516 U.S. at 515; *see also Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 613 (6th Cir. 1998) (holding that an individual who brings a lawsuit pursuant to § 1132(a)(1)(B) to challenge a denial of disability benefits does not also have a right to a cause of action for breach of fiduciary duty under § 1132(a)(3)). For these reasons, plaintiff's claim for breach of fiduciary duties fails and defendants are entitled to judgment as a matter of law on that claim.

C.    Denial of Benefits

Again, as the Court determined above, the applicable standard of review of defendants' denial of plaintiff's long-term disability benefits is the arbitrary and capricious standard of review. Defendants' denial of benefits will not be arbitrary and capricious if it is "rational in light of the plan's provisions." *Davis v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1988).

The Court has carefully reviewed the administrative record in light of the applicable standard of review and finds that defendants' decision to terminate plaintiff's long-term disability benefits should be upheld. The administrative record contains sufficient evidence to support defendants' decision in that the medical records and opinions submitted by Dr. Koenig, Dr. Carlson, Dr. Bergia, Dr. Rouben, and Dr. Brown individually and cumulatively support the conclusion that, pursuant to the more stringent definition of "Total Disability" applicable to plaintiff, [AR at 16], plaintiff is capable of performing some reasonable occupation – specifically, a sedentary job with certain limitations as to plaintiff's use of his hands and amount of time continually working.

First, in addition to tracking plaintiff's positive results from his carpal tunnel-related surgery on November 6, 2001, Dr. Koenig's multiple examinations of plaintiff after his initial post-operative visit each conclude that plaintiff would be able to return to work on a "modified" or "limited duty status," with Dr. Koenig recommending restrictions on plaintiff's lifting, amount of time typing and gripping, and length of work shift. [AR at 347, 353, 356, 358, 362, 366, 370, 373.] These determinations are particularly persuasive given

the number of times Dr. Koenig examined plaintiff and the consistency with which he concluded that plaintiff was able to return to work, albeit with some limitations. These limitations, however, do not result in plaintiff meeting the high standard of Total Disability applicable to him of being unable to perform any job that he is or could become qualified to do given his education, training, or experience. [AR at 16.] Furthermore, the Court notes that Dr. Koenig's last opinion regarding plaintiff's ability to work stipulated only that he perform a sedentary job with shifts no greater than eight hours. [AR at 139]. It did not otherwise restrict or limit plaintiff's working in any way. Thus, in light of the quantity and quality of evidence from Dr. Koenig indicating that plaintiff was capable of working, defendants' decision to uphold the termination of his long-term disability benefits was reasonable.

Supporting Dr. Koenig's conclusions are the evaluations of Dr. Carlson and Dr. Bergia, both of whom examined plaintiff and also determined that he would be able to perform his job as Project Manager with certain modifications. [AR at 265, 332.] In fact, Dr. Carlson went so far as to opine that plaintiff "should at this point return to modified duty using his computer" in order to better facilitate his recovery. [AR at 332.] Additionally, the holistic and comprehensive review of plaintiff's medical records by Dr. Brown further supports this contention. Again, it strikes the Court as persuasive that, upon reviewing all of plaintiff's medical records from 2001 onward, Dr. Brown also concluded that plaintiff could return to work as Project Manager, with the only needed accommodations being

"maximum typing or computer use for one hour with breaks as needed" and no greater than an eight-hour work shift. [AR at 157.]

Plaintiff argues that because the FCE from Knoxville Physical Therapy, Inc. indicates that he is "unable to tolerate prolonged sitting or static positions such as bending, standing or kneeling," that he is therefore "unable to perform the tasks of sedentary work or any other job...." [AR at 314.] However, the FCE itself indicates that plaintiff is qualified for "sedentary" jobs and "can tolerate sitting doing keyboard or computer work intermittently for 4 hours/day with stretch breaks." [AR at 315.] This conclusion simply does not support plaintiff's claim that he is unable to perform any job. Rather, it indicates that plaintiff would be able to perform a sedentary job with certain accommodations, thereby making it apparent that he was not totally disabled for the purposes of an award of long-term disability under the Plan.

With regards to Dr. McNiel's conclusion that plaintiff "is totally disabled and unemployable," [AR at 196], defendants correctly note that Dr. McNiel's rather broad opinion is unsupported by any records documenting a treating or examining relationship with plaintiff or a real reason for his diagnosis. While plaintiff claims that Dr. McNiel had been treating him since October 7, 2003, [Doc. 20 at 6], there is no indication – either from Dr. McNiel's two-page report or plaintiff counsel's cover letter to it – if or when Dr. McNiel examined plaintiff and what records he reviewed in making his determination that plaintiff was "totally disabled and unemployable." [*See* AR at 195-197.] Furthermore, Dr. McNiel's report never indicates what he means when he opines that plaintiff is "totally disabled" and

accordingly, whether that understanding of total disability is the same as the Plan's definition of Total Disability. Thus, defendants were not acting arbitrarily or capriciously in determining that Dr. McNiel's report on plaintiff does not present the kind of clinical evidence necessary to prove that plaintiff was indeed totally disabled under the Plan.

Similarly, the Tennessee Department of Labor and Work Force Development Standard Medical Form prepared by Dr. Rouben does not demonstrate that defendants acted arbitrarily or capriciously in upholding their decision to deny plaintiff long-term disability benefits in light of it. On the form, Dr. Rouben writes that plaintiff was presently "temporarily totally disabled," [AR at 191], but nowhere on the form is it suggested that the Tennessee Department of Labor and Work Force Development's definition of "total disability" is the same as that under the Plan. Furthermore, Dr. Rouben's particularized findings about plaintiff resulting from his functional capacity assessment of him, [AR at 192], indicate that plaintiff was not unable to work. Specifically, Dr. Rouben noted that plaintiff was able to stand, walk, and sit for a total of six hours per eight-hour day and that any restrictions he had were "specific to his hands." [*Id.*] Based upon these findings, defendants' determination that plaintiff was able to work despite Dr. Rouben checkmark indicating that plaintiff was currently suffering "temporary total disability," [AR at 191], strikes the Court as being entirely reasonable.

Taken together, plaintiff's ample medical records as well as the other medical opinions and evidence contained in the administrative record is overwhelmingly supportive of defendants' decision to terminate plaintiff's long-term disability benefits based upon his

failure to meet the definition of "total disability" under the Plan. Thus, defendants' decision was not arbitrary and capricious.

D.      Demand for Attorney's Fees

Plaintiff also demands attorney's fees as set forth in 29 U.S.C. § 1132(g)(1), which states, "[i]n any action under this title...by a participant..., the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." The Sixth Circuit has articulated the following five factors which a court should consider in determining whether to award costs and fees:

> (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar circumstances; (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and (5) the relative merits of the parties' positions.

*Sec'y of Dep't of Labor v. King*, 775 F.2d 666, 669 (6th Cir. 1985) (citations omitted). Given the disposition of this matter as discussed above, the Court is of the opinion that all of the factors, except for perhaps "the opposing party's ability to satisfy an award," weigh in favor of defendants. Accordingly, the Court will decline to award plaintiff costs and fees.

II.     **Conclusion**

For the reasons set forth herein, plaintiff's Motion for Judgment on the Record [Doc. 20] is **DENIED** and defendants' Motion for Judgment Affirming the Decision of the

Employee Benefits Committee [Doc. 21] is **GRANTED**, and judgment will be entered in

favor of defendants.

The Clerk is directed to entered judgment accordingly.


s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE